| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1**<br><br>**THOMPSON HINE LLP**<br>Jeremy Campana (NJ Bar ID 031852000)<br>Curtis L. Tuggle (*pro hac vice* forthcoming)<br>Jonathan S. Hawkins (*pro hac vice* forthcoming)<br>3900 Key Center<br>127 Public Square<br>Cleveland, OH 44114<br>Telephone: 216.566.5500<br>Email: jeremy.campana@thompsonhine.com<br>       curtis.tuggle@thompsonhine.com<br>       jonathan.hawkins@thompsonhine.com<br><br>*Attorneys for the Merchants Parties* | |
| In re:<br><br>CROWN CAPITAL HOLDINGS LLC, *et al*.<br><br>Debtors. | Chapter 11<br><br>Case No. 25-15351 (MBK)<br><br>(Joint Administration Request Pending) |

## OBJECTION OF THE MERCHANTS PARTIES TO DEBTORS' MOTION FOR POST-PETITION FINANCING AND RELATED RELIEF

Computershare Trust Company, National Association, as trustee for the benefit of the Registered Holders of Merchants Multifamily Trust 2022-RSS1, Multifamily Mortgage Pass-Through Certificates Series 2022-RSS1 and Merchants Bank of Indiana, acting by and through their Special Servicer, Merchants Capital Corp. (collectively, "***Merchants***"), by and through undersigned counsel, respectfully objects to the Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (the "***DIP Motion***"), and states as follows:

1

**I.     PRELIMINARY STATEMENT**

1. The Debtors[1] ask this Court to approve a priming, cross-collateralized, estate-wide DIP facility designed not to stabilize assets in distress but to position the proposed DIP lender and its affiliates as stalking horse purchasers with credit-bid rights, break-up fees, expansive and inappropriate releases, and case control milestones. Merchants Bank – the holder of first-priority, perfected mortgage liens on seven properties (the "*Subject Properties*") that would be subject to the DIP – opposes the DIP Motion as unnecessary and imprudent. Each of the Subject Properties are already in the custody of duly appointed and competent state-court receivers, have been extensively marketed by a reputable national brokerage (Newmark), and are either under executed purchase agreements or subject to letters of intent reflecting valuations in excess of the anticipated stalking horse bids contemplated by the DIP structure. The Subject Properties are on a path that will maximize value for stakeholders without the expensive DIP loans.

2. Compounding these concerns, there is no filed, property-level "Approved Budget" accompanying the Interim Order (Exhibit 1 is a slip sheet "to come") yet the initial $6.45 million interim draw is slated, per the DIP Term Sheet, to fund substantial non-operational items, including approximately $1.775 million in "restructuring costs" deposited into a professional-fee escrow, a DIP origination fee on the interim draw (another $193,506), and an interest reserve of $129,004 that would protect the DIP lender's unusually high 18% annual interest rate. By contrast, capital expenditure outlays on the interim draw are a mere $1.37

---

[1] For purposes of this Objection, the term "Debtors" shall collectively mean Evergreen Regency Townhomes, LTD. (25-20506), Slidell Apartments LLC (25-20522), Mon View Apts LLC (25-20515), Woodside Village Owner LLC (25-20529), Palisades Apts LLC (25-20517), Gallatin Apts LLC (25-20509), and Valley Royal Court Apts LLC (25-20526).

million. The interim draw appears to be less about property preservation and tenant welfare, and more about ensuring professionals fees are paid.

3. The Debtors are unable to meet their heavy burden under section 364(d) of the Bankruptcy Code to justify non-consensual priming. They have not shown a genuine necessity for new credit, nor are they able to show how Merchants' interest in the Subject Properties will be adequately protected. Instead, the DIP construct strips control from court-appointed receivers, grants blanket senior liens and superpriority claims across all the estates, and furnishes broad releases and waivers in favor of parties responsible for pre-petition management of a number of the properties. The DIP lender's goal is to halt the ongoing sale processes in favor of a new sale process that gives the DIP lender an unfair advantage and the ability to purchase the Subject Properties for substantially less than they are worth.

4. The Court should deny the DIP Motion as it relates to Merchants' collateral. If the Court is inclined to authorize some DIP borrowing, Merchants' respectfully submits that it should prohibit priming liens on the Subject Properties; (ii) preserve receivership control over the rents and properties; (iii) require cash collateral usage with tailored, property-level adequate protection; and (iv) refuse to authorize the sweeping releases and waivers that are neither necessary nor appropriate at this stage.

**II.    BACKGROUND**

5. Merchants is the first-lien mortgagee on seven of the 19 real properties the Debtors seek to encumber with the proposed DIP facility. All of the Subject Properties are currently under receivership in their respective jurisdictions and have been for more than 120 days. During this period, the receivers, working with Newmark as broker, have extensively marketed the Subject Properties, yielding executed contracts and letters of intent at values that

3

exceed the contemplated stalking horse proposals the DIP lender seeks to advance (but still less than the amount owed to Merchants Bank) *by millions of dollars*. Likewise, during this period, Merchants -- not the Debtors, the bondholders, or the proposed DIP lender -- has funded operating shortfalls with protective advances to preserve tenant welfare and collateral condition while these court-supervised sale processes unfolded. The table below summarizes key facts concerning the state of the Subject Properties and the pre-petition mortgage debts encumbering those properties:

| Debtor | Property Location | Receiver | Appointment Date | Approx. Loan Balance[2] | Status of Sale |
|---|---|---|---|---|---|
| Slidell Apartments LLC | Flint, MI | Hilco | 1/9/2025 | $8 million | Under Contract |
| Evergreen Regency Townhomes, LTD. | Flint, MI | Hilco | 1/14/2025 | $25.1 million | Under LOI |
| Mon View Apts LLC | Pittsburgh, PA | Trigild | 12/12/2024 | $21.1 million | Under LOI |
| Palisades Apts LLC | Pittsburgh, PA | Trigild | 12/12/2024 | | Under LOI |
| Gallatin Apts LLC | Pittsburgh, PA | Trigild | 12/12/2024 | | Under LOI |
| Valley Royal Court Apts LLC | Pittsburgh, PA | Trigild | 12/12/2024 | | Under LOI |
| Woodside Village Owner LLC | Danville, VA | Trigild | 1/23/2025 | $12.3 million | Under Contract |

6.   The Subject Properties have already been subject to a thorough marketing campaign – a campaign that the anticipated stalking horse bidders were well aware of, but chose not to participate in.[3] Newmark provided data room diligence, and coordinated tours, secured expressions of interest, and identified actionable interest across the portfolio of Subject

---

[2] *See generally* the Declaration of Tucker Watson, which shall be filed hereafter on the Court's docket.
[3] Indeed, Lynd Living – an affiliate (who apparently stands to gain a release under the DIP order) of the DIP lender and a stalking horse buyer – is actively managing five of the seven Merchants Properties and participated in populating data rooms for the receivers' buyers.

4

Properties. Consequently, the Subject Properties are all under contract or LOI at values superior to the stalking horse constructs embedded in the DIP Term Sheet.

7. On Monday, October 6, 2025 (the "*Petition Date*"), without warning or consultation with Merchants or the receivers, the Debtors filed chapter 11 petitions. Following the Petition Date, the Debtors in this proceeding filed the DIP Motion, again, without consultation with or notice to Merchants. In fact, the DIP Motion itself appears to have been served upon only a handful of pre-existing case participants – none of the pre-petition lenders and certainly not Merchants. Merchants only discovered the DIP Motion through its own diligence – not through any efforts of the Debtors.

8. Debtors' haphazard methods are punctuated with underlying conflicts of interest. Lynd (through affiliates) is acting as property manager for five (5) of the seven (7) Subject Properties, is a proposed stalking horse for certain assets, and is aligned with the proposed DIP/stalking horse cohort. The DIP Term Sheet also contemplates assumption of existing service agreements with the Group B stalking horse bidder (a Lynd affiliate), effectively entrenching a conflicted manager while it (or its affiliate) seeks to acquire the same properties. As the property manager is often required to participate in the sale process by furnishing information about the subject property timely, the fact that under the DIP, Lynd will act as a buyer and a manager creates opportunities for an unfair and value-destructive sale process. Lynd's intertwined roles create an inherent conflict, distort incentives around capital expenditures, rent collections, and leasing, and threaten to chill competing bids.

### III. ARGUMENT

9. To obtain authorization to incur secured, priming post-petition debt, the Debtor must show (1) there is a legitimate need for the funding; (2) the Debtor cannot obtain such credit

on more favorable terms; (3) the terms are fair, reasonable and adequate "given the circumstances"; and (4) the pre-petition secured lender being primed is provided adequate protection of its interests. 11 U.S.C. § 364(d); *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987). Subsection (d) "is actually a provision to be invoked only in the most compelling and extraordinary circumstances." *In re Dunckle Assocs., Inc.*, 19 B.R. 481, 485 (Bankr. E.D. Pa. 1982). The burden of proof is on the movant. *Res. Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994).

### A.    Debtors have Failed to Justify Necessity of Borrowing

10.    Debtors have failed the primary task – demonstrating that post-petition financing is needed at all. The DIP Motion recites, without further explanation, that the new money is needed because:

> The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash. The Debtors will be unable to operate their business as a going concern in the near term without the ability to access the DIP Facility and use cash collateral[4] and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.

*DIP Motion*, ¶ 58 (footnote added).

11.    Debtors' generic statement of need supplies little guidance on why, at this late stage, there is a sudden "near term" need for cash. The closest Debtors come is their assertion that the new funds will help avoid "an immediate shutdown of the Debtors' operations…" *DIP Motion*, ¶ 23. This assertion is not based in fact. The Debtors have not been operating their businesses *at all* since at least December 2024 – rather, the Debtors long ago effectively "shutdown" and abandoned the projects, leaving the local court-appointed receivers to clean up

---

[4] Notably, there is no request pending for the use of Merchants' cash collateral (nor does Merchants consent).

6

the mess and re-stabilize the Subject Properties with protective advances made by Merchants. The Subject Properties are already under receivers' control, stabilized through court supervision, and in mature sale processes reflecting market-tested values. The asserted need to prime for "rehabilitation," "operational," and "case administration" expenses is neither tied to the specific circumstances of the Subject Properties nor shown to be unavailable through less intrusive means, including consensual cash collateral budgets, property-level protective advances, or limited, junior DIP structures on truly unencumbered assets.

12. The sudden need for financing appears instead to be driven by a desire to cover unspecified "Restructuring Costs" and pay the DIP lender's origination and other fees. *See DIP Motion*, Ex. A, p. 25 (sources and uses exhibit to the DIP Term Sheet). In contrast, and unlike the Debtors, Merchants has supplied substantial post-default protective advances and financing to the Subject Properties through the receivers. In short, Debtors cannot demonstrate any need for post-petition financing, let alone DIP financing that subordinates existing liens.

### B.     The Debtors Failed to Demonstrate Lack of Other Credit

13. To obtain authorization to grant a post-petition lender superpriority status, the debtor must show "exhaustive unsuccessful efforts to obtain credit" on more favorable terms. *In re Crouse Group, Inc.*, 71 B.R. at 550. In *Crouse*, the bankruptcy court found that approaching one financial institution, failing to make a proposal to the existing secured lender, and failing to seek funds from within the debtor's parent company was a "feeble showing" of the efforts needed to obtain credit on superpriority terms. *Id*.

14. Debtors baldly assert "No other party was willing to provide financing." *DIP Motion*, ¶ 10. Absent is any description of efforts undertaken by Debtors to look for such financing, the terms encountered in the market, the institutions that refused, or alternative

7

sources considered. Although Debtors acknowledge that they must, minimally, demonstrate a good faith effort to ensure credit is not available on better terms, the DIP Motion is silent on what those efforts were to evaluate other sources of financing. *DIP Motion*, ¶ 28. Certainly, despite having functionally financed the Debtors' properties for the better part of a year, at no point did Debtors seek financing from Merchants. The failure to show the "requisite exhaustive unsuccessful efforts" is fatal to the DIP Motion. *Crouse*, 71 B.R. at 550. The Debtors' preference for a global, control-heavy DIP that advances the DIP constituency's acquisition strategy is not a substitute for the statutory requirement to exhaust less-intrusive alternatives on a property-by-property basis.

### C.     The Terms of the DIP Financing are Not Fair or Reasonable

15.     Many of the details of the DIP loan are unknown. The DIP loan documents have yet to be shared. The DIP loan is subject to an Approved Budget, which has not been furnished. However, based on what little is known, the terms are not fair. Aside from the subordination of liens, the DIP Term Sheet provides a broad release which provides that each "DIP Lender Released Party" is released from and indemnified against any claims "arising out of or relating to the Debtors." *DIP Motion*, Ex. A, pp. 17, 19. Based on the broad definition of DIP Lender Released Party, Lynd Living, the property manager, will have excused any pre-petition liability it may have to the estates. Given that Lynd Living manages many of the Debtors' properties, the full extent of this release is potentially far broader and meaningful than the Debtors might have the Court believe.

16.     Additionally, the DIP Term Sheet is purpose-built to create stalking horse platforms for the DIP lender and an affiliate group, with credit-bid rights, break-up fees, and aggressive milestones. This structure puts a thumb on the scale in favor of the DIP cohort while

the receivers' sale processes, which have already generated superior value indications, are tossed in the bin. The required assumption of existing service agreements with the Group B stalking horse bidder (affiliated with Lynd) cements a conflicted manager during the bid period, discouraging other bidders and creating the perception that the outcome of this sale process is a pre-ordained outcome. The Court should not permit a DIP facility to be used as a vehicle to channel assets to preferred bidders at the expense of existing first-lien lenders.

17. Other unfairness abounds. Notably, a condition of the adequate protection payments is that the secured lender "not object" to the DIP Motion. *DIP Motion*, Ex. B at ¶ 8(c). Apparently, "fair" is whatever Debtors tells the to-be-subordinated lenders it is. Finally, on top of all of this, the Debtors hope to accomplish this result with legally deficient and shortened notice to the effected creditors.

### D. The Debtors Cannot Provide Adequate Protection

18. "[A] determination of whether there is adequate protection is made on a case by case basis." *Swedeland*, 16 F.3d at 564. The objective "is to ensure that the creditor receives the value for which he [or she] bargained prebankruptcy." *Id.* (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987). In other words, the pre-petition secured creditor should have "the same level of protection it would have had if there had not been post-petition superpriority financing." *Id.* In *Swedeland*, the Third Circuit agreed with the district court's reversal of the bankruptcy court on the issue of adequate protection because the debtor "offered no new consideration to [the secured lender] to offset its diminution of interest as a result of the superiority lien given to [the DIP lender]." *Id.* at 564-65.

19. Similarly, here, Debtors cannot provide adequate protection to Merchants. Debtors offer (conditioned on not objecting) non-default interest-only payments and a lien on

9

recoveries from unspecified claims against Mr. Silber, an individual convicted of defrauding lenders. Under the proposed financing, adequate protection payments are advanced by the DIP lender and the amount advanced becomes a DIP lien – not just on the property for which the payment was made, but across the entire portfolio of properties – *i.e.*, "all assets" of the Debtors. *See DIP Motion*, Ex. A, p. 16. Consequently, as time passes, the DIP lender's priming liens will grow without a demonstrable *improvement* in the value of the properties, meaning that, as time passes, Merchants' position deteriorates.

20. The Debtors have not met their heavy burden to justify priming under section 364(d) as to the seven Subject Properties. The proposed DIP construct is not tailored to the needs of the Subject Properties. It is a global, cross-collateralized facility with centralized cash sweeps and lockboxes and milestones designed around stalking horse agreements intended to supplant the deals struck after substantial pre-petition marketing efforts by the receivers. The DIP proposes replacement liens, superpriority claims, and periodic interest payments at the non-default rate only if the prepetition lender "does not object" to the interim order. Conditional and contingent interest payments are not adequate protection when the DIP simultaneously primes liens, diverts cash, and imposes case control milestones that affect disposition timing and process. Replacement liens on a shrinking collateral base behind a superpriority, cross-collateralized DIP are likewise inadequate.

21. The Debtors also seek to waive 506(c) surcharge rights and the "equities of the case" under 552(b) at the final order stage. Those waivers further erode adequate protection by depriving Merchants of statutory protections that preserve collateral value when estate expenditures benefit the collateral. They are improper, especially at the outset and over the objection of an affected secured creditor.

22. The DIP would centralize all postpetition rents into DIP-controlled clearing accounts, assert priming liens on those funds, and override receivers' cash management protocols. Merchants' loan documents include assignments of leases and rents and cash management provisions implemented by the receivers. The Debtors' attempt to recharacterize and redirect those rents as DIP collateral and "cash collateral" for DIP purposes is inconsistent with state-law receivership orders and bargained-for assignments. Additionally, because these custodians have been in place for well over 120 days, such turnover may be excused and the existing receivership regime retained for the benefit of creditors and tenants. 11 U.S.C. § 543(d).

23. The receivers' record of stabilized operations, market-tested sale processes, and lender-funded protective advances confirms that continued custodianship—not displacement by a priming DIP—is in the best interest of the creditors of these estates.

IV. **RESERVATION OF RIGHTS**

24. Merchants reserves all rights to supplement this Objection, submit evidence, cross-examine witnesses, and be heard at any interim or final hearings. Merchants Bank also joins in any objections by other prepetition secured lenders, or parties in interest to the extent not inconsistent herewith. Merchants further reserves the right to preclude turnover from the receivers and seek dismissal of these cases.

| | |
|---|---|
| Dated: October 9, 2025 | Respectfully Submitted |
| | **THOMPSON HINE LLP** |
| | /s/ Jeremy Campana |
| | Jeremy Campana (NJ Bar ID 031852000)
Curtis L. Tuggle (*pro hac vice* forthcoming)
Jonathan S. Hawkins (*pro hac vice* forthcoming)
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: 216.566.5500
Email:  jeremy.campana@thompsonhine.com
            curtis.tuggle@thompsonhine.com
          jonathan.hawkins@thompsonhine.com |
| | *Attorneys for the Merchants Parties* |