UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**HOLLAND & KNIGHT LLP**
Barbra R. Parlin (NJ Bar No. 008211995)
787 Seventh Avenue, 31st Floor
New York, New York 10019
Tel.:  (212) 513-3200
barbra.parlin@hklaw.com

*Counsel for Capital Funding, LLC*

In re:

CROWN CAPITAL HOLDINGS LLC, *et al.*

Debtors.[1]

Chapter 11

Case No. 25-15351 (MBK)

(Jointly Administered)

**NOTICE OF HEARING ON CAPITAL FUNDING, LLC'S MOTION FOR ENTRY OF AN ORDER (I)(A) DISMISSING THE BANKRUPTCY CASE OF BELLEFIELD DWELLINGS APTS LLC, OR, ALTERNATIVELY, (B) ABSTAINING FROM EXERCISING JURISDICTION OVER BELLEFIELD DWELLINGS APTS LLC, OR, ALTERNATIVELY, (C) LIFTING THE AUTOMATIC STAY, (II) WAIVING THE TURNOVER REQUIREMENTS OF SECTION 543 OF THE BANKRUPTCY CODE, AND (III) WAIVING THE FOURTEEN DAY STAY OF AN ORDER PURSUANT TO <u>RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE</u>**

**PLEASE TAKE NOTICE** that on **November 18, 2025 at 1:30 p.m. (prevailing Eastern time)**, or as soon thereafter as counsel may be heard, Capital Funding, LLC ("<u>Capital Funding</u>"), by and through its undersigned counsel, shall appear before the Honorable Michael B. Kaplan, United States Bankruptcy Judge, in Courtroom 8 of the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Trenton, NJ 08608, and seek the entry of an order granting *Capital Funding, LLC's Motion for Entry of an Order (i)(a) Dismissing the Bankruptcy Case of Bellefield Dwellings Apts LLC, or, Alternatively, (b) Abstaining From Exercising Jurisdiction Over Bellefield Dwellings Apts LLC, or, Alternatively, (c) Lifting The Automatic Stay, (ii) Waiving the Turnover Requirements of Section 543 of the Bankruptcy Code, and (iii) Waiving the Fourteen Day Stay of an Order Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure* (the "<u>Motion</u>") substantially in the form of order submitted with the Motion.

---

[1] The lead debtor in these chapter 11 cases, along with the last four digits of the debtor's federal tax identification number, is Crown Capital Holdings LLC (1411). A complete list of each of the debtors in these chapter 11 cases and their service address for purposes of these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/CrownCapital.

**PLEASE TAKE FURTHER NOTICE** that the Motion sets forth the relevant legal and factual bases upon which the relief requested should be granted. A proposed order granting the relief requested in the Motion is also submitted with the Motion.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion shall: (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the *General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002* (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary, so as to be received no later than seven (7) days prior to the hearing date set forth above.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases, including the exhibits appended to the Motion, may be obtained free of charge by visiting the website of Omni Agent Solutions, Inc., at https://omniagentsolutions.com/CrownCapital. You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that unless objections are timely filed and served, the Motion will be decided on the papers in accordance with D.N.J. LBR 9013-3(d) and the relief requested may be granted without further notice or hearing.

**PLEASE TAKE FURTHER NOTICE** that contemporaneously with the filing of the Motion, Capital Funding is filing a request that the Motion be heard on an expedited basis at a hearing scheduled for October 30, 2025 at 11:30 a.m. (prevailing Eastern Time). If this request is granted, Capital Funding shall file and serve a subsequent notice reflecting the new hearing date and time.

[remainder of the page intentionally left blank]

DATED: October 17, 2025
      New York, New York

**HOLLAND & KNIGHT LLP**

**By:**  /s/ *Barbra R. Parlin*
Barbra R. Parlin (NJ Bar No. 008211995)
787 Seventh Avenue, 31st Floor
New York, New York 10019
Tel.:  (212) 513-3200
barbra.parlin@hklaw.com

-and-

Tyler Layne (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Tel.: (615) 244-6380
tyler.layne@hklaw.com

-and-

Steven J. Levitt (admitted *pro hac vice*)
1722 Routh Street, Suite 1500
Dallas, TX 75201
Tel.: (214) 964-9500
steven.levitt@hklaw.com

*Counsel for Capital Funding, LLC*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**HOLLAND & KNIGHT LLP**
Barbra R. Parlin (NJ Bar No. 008211995)
787 Seventh Avenue, 31st Floor
New York, New York 10019
Tel.:  (212) 513-3200
barbra.parlin@hklaw.com

*Counsel for Capital Funding, LLC*

In re:

CROWN CAPITAL HOLDINGS LLC, *et al.*

Debtors.[1]

Chapter 11

Case No. 25-15351 (MBK)

(Jointly Administered)

**CAPITAL FUNDING, LLC'S MOTION FOR ENTRY OF AN ORDER (I)(A) DISMISSING THE BANKRUPTCY CASE OF BELLEFIELD DWELLINGS APTS LLC, OR, ALTERNATIVELY, (B) ABSTAINING FROM EXERCISING JURISDICTION OVER BELLEFIELD DWELLINGS APTS LLC, OR, ALTERNATIVELY, (C) LIFTING THE AUTOMATIC STAY, (II) WAIVING THE TURNOVER REQUIREMENTS OF SECTION 543 OF THE BANKRUPTCY CODE, AND (III) WAIVING THE FOURTEEN DAY STAY OF AN ORDER PURSUANT TO RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Capital Funding, LLC ("Capital Funding"), by and through its undersigned counsel, files

this *Motion for Entry of an Order (i)(a) Dismissing the Bankruptcy Case of Bellefield Dwellings*

*Apts LLC, or, Alternatively, (b) Abstaining from Exercising Jurisdiction over Bellefield Apts LLC,*

*or, Alternatively, (c) Lifting the Automatic Stay, (ii) Waiving the Turnover Requirements of*

---

[1] The lead debtor in these chapter 11 cases, along with the last four digits of the debtor's federal tax identification number, is Crown Capital Holdings LLC (1411). A complete list of each of the debtors in these chapter 11 cases and their service address for purposes of these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/CrownCapital.

*Section 543 of the Bankruptcy Code, and (iii) Waiving the Fourteen Day Stay of an Order Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure* (the "Motion").[2]

## PRELIMINARY STATEMENT

1.      The bankruptcy proceeding of Bellefield Dwellings Apts LLC's ("Bellefield") should be dismissed because, among other things, it was filed without proper corporate authority and without regard to the harm it would cause by interfering with an ongoing receivership that had already been pending for ***nine months*** and was nearing the end of a well-run, court-supervised sales process.  Bellefield's bankruptcy serves no useful purpose, while it could cause substantial harm to Bellefield's stakeholders by, among other things, interfering with the nearly-complete receivership sales process and adding ***millions*** of dollars of unnecessary, wasteful, and duplicative professional fees.

2.      During the nine (9) month period that Bellefield was subject to the receivership prior to the bankruptcy filing, the court-appointed receiver expended substantial time and effort stabilizing Bellefield's operations, repairing and maintaining the property to ensure the safety of its residents, bringing Bellefield into compliance with applicable law (including regulations promulgated by the Department of Housing and Urban Development ("HUD")), assisting Bellefield's tenants with complying with HUD requirements, collecting debts owed to Bellefield, and pursuing the sale of Bellefield's primary asset, a low-income housing complex.  In furtherance of the sales process, the receiver hired a qualified real estate broker with specific expertise in HUD properties—Newmark Group, Inc. ("Newmark")—who solicited over 14,000 potential bidders, received ███████ bids or indications of interest, and was on the verge of selecting a winning bidder, obtaining approval of the proposed sale from the receivership court, and winding down the

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed in the DIP Motion (as defined herein).

receivership.  Notably, ████████████████████████████████████████████

████████████████████████████████████

3.      In filing a bankruptcy on behalf of Bellefield, the Debtors lacked basic facts
regarding the property, including whether it was generating enough cash flow to forgo the need
for *millions* of dollars of DIP financing.  Notably, in continuing the DIP hearing without seeking
approval of *any* portion of the interim financing, the Debtors effectively admitted that *none* of the
$6,450,187.23 of interim financing that was allegedly needed to stave off an emergency was
actually needed at that time.[3]

4.      And while the Debtors implied that the reason they misjudged the need for interim
financing was that they had trouble obtaining information from the receivers,[4] upon information
and belief, the Debtors never requested such information from the Bellefield receiver (the
"Receiver") prior to filing Bellefield's bankruptcy.  Because of the Debtors' apparent failure to
coordinate with the Receiver prior to filing the bankruptcy case for Bellefield, the Debtors also
failed to obtain basic information regarding Bellefield's cash needs (or, rather, the lack thereof),
the status of the Receiver's ongoing sale process, and the impact a bankruptcy would have on such
sale process.

5.      Moreover, the independent fiduciary of certain of Bellefield's affiliates,
Ms. Elizabeth A. LaPuma ("LaPuma"), lacked the authority to file Bellefield's bankruptcy
petition, as neither she nor any companies under her control are the managing member of
Bellefield.  The managing member is vested by Bellefield's limited liability company agreement

---

[3] "Having engaged with those parties and received information from many of those parties, the debtors now believe that approval of the DIP financing at this point is premature and we believe we can have funding of these cases for at least the interim period of time on a cash collateral basis."  Tr. of H'rg dated Oct. 9, 2025 at 9:25-10:4.

[4] "[We] were acting in a bit of a bind because we didn't have perfect information since many of these properties are under the control of receivers."  *Id*. at 9:2-4.

3

with the exclusive authority to manage Bellefield's business and operations.    Through an "Omnibus Consent," which purports to affect a number of the Debtors, LaPuma, through her control of certain members of Bellefield, attempted to replace Bellefield's managing member with another entity under LaPuma's control.    But the consent did not comply with Delaware law, rendering the consent void.    Thus, LaPuma did not have authority to file Bellefield's bankruptcy petition.

6.    The purported filing of Bellefield's bankruptcy case risks undoing much of the work that the receiver has completed and has thrown the sale process into disarray.    Accordingly, for the reasons set forth herein, Bellefield's bankruptcy case should be dismissed, the Court should abstain from exercising jurisdiction over Bellefield to allow the Receiver to complete his mandate in an expeditious manner, and/or the automatic stay should be lifted to allow the Receiver to consummate a sale of the Bellefield Property.

## **<u>JURISDICTION</u>**

7.    The United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference of the Bankruptcy Court Under Title 11, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).

8.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.    The bases for the relief requested herein are sections 105(a), 305, and 543 of the Bankruptcy Code, rules 1017 and 4001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the Local Bankruptcy Rules for the District of New Jersey (the "<u>Local Rules</u>").

**RELIEF REQUESTED**

10.     By the Motion, Capital Funding respectively requests entry of an Order, substantially in the form attached as **Exhibit A**, (i)(a) dismissing Bellefield's bankruptcy case as having been filed without proper corporate authority, or, in the alternative (b) abstaining from exercising jurisdiction over Bellefield's bankruptcy case, or, in the alternative, (c) lifting the automatic stay, (ii) waiving any turnover requirements that apply to the Receiver under section 543 of the Bankruptcy Code, and (iii) waiving any fourteen-day stay requirements under Bankruptcy Rule 4001.

**BACKGROUND**

**A.   Capital Funding's Relationship with the Debtors**

11.     On or about February 23, 2023, Capital Funding and Bellefield entered into that certain Loan Agreement (the "Loan Agreement"), whereby Capital Funding issued to Bellefield a commercial mortgage loan in the original principal amount of Twenty-Six Million Eight Hundred Thousand Dollars (the "Loan").  Bellefield used the Loan proceeds to finance its acquisition of certain real property and improvements located at 4400 Centre Avenue, Pittsburgh, Pennsylvania 15213 (the "Bellefield Property"), to fund reserves, and to pay closing costs and fees. A true and correct copy of the Loan Agreement is attached hereto as **Exhibit B**.

12.     The Loan is evidenced by a Promissory Note dated February 23, 2023, executed by Bellefield in favor of Capital Funding in the original principal amount of Twenty-Six Million Eight Hundred Thousand and 00/100 Dollars ($26,800,000.00) (the "Note"), a true and correct copy of which is attached as **Exhibit C**.

13.     To secure Bellefield's repayment obligations under the Note, Bellefield executed an Open-End Mortgage and Security Agreement (the "Mortgage") in favor of Capital Funding

secured by, among other things, the Bellefield Property, dated as of February 23, 2023.  A true and correct copy of the Mortgage is attached hereto as **Exhibit D**.  The Mortgage was duly recorded on March 1, 2023, at document number 2023-9179 in the Allegheny County Department of Real Estate in Pittsburgh, Pennsylvania.

14.     Additionally, on February 23, 2023, Bellefield executed an absolute Assignment of Rents and Leases ("Assignment of Rents") in favor of Capital Funding.  The Assignment of Rents absolutely transferred and assigned to Capital Funding all of the Leases, Rights, Rents, Guaranties, Damages, interests, and privileges (as defined in the Assignment of Rents) in the Bellefield Property.  A true and correct copy of the Assignment of Rents is attached hereto as **Exhibit E**.

15.     Importantly, the Bellefield Property is the subject of that certain Section 8 Housing Assistance Payments Contract, identified as HAP Contract Number PA28H084016.  Thus, on February 23, 2023, Bellefield assumed and was assigned the HAP Contract by entering into that certain Assignment, Assumption and Amendment Agreement Section 8 Housing Assistance Payments Contract with the seller of the Bellefield Property, HUD, and Pennsylvania Housing Financing Agency (the "HAP Contract").  A true and correct copy of the HAP Contract is attached hereto as **Exhibit F**.

16.     Bellefield and Capital Funding simultaneously entered into that certain Assignment of Housing Assistance Payment Contract, also dated February 23, 2023 (the "Assignment of HAP Contract," and together with the Loan Agreement, Note, Mortgage, and Assignments of Rents, the "Loan Documents"), whereby Bellefield "absolutely, unconditionally and irrevocably transfer[ed], convey[ed], set[] over and assign[ed] to Agent, all of its right, title and interest (including the right to receive payments due thereunder) in and to the HAP Contract" and "to authorize and empower [Capital Funding] to exercise all rights and remedies available under the HAP Contract without

6

the necessity of further action of the Borrower." Assignment of HAP Contract, § 3(a).  A true and correct copy of the Assignment of HAP Contract is attached hereto as **Exhibit G**.

17.     Because HAP contracts may only be assigned with HUD's consent, Bellefield and HUD separately agreed to grant Capital Funding a security interest in the HAP Contract to secure the Loan. A true and correct copy of the HUD Consent to Assignment of HAP Contract is attached hereto as **Exhibit H**.

18.     As of October 8, 2025, Bellefield owes Capital Funding not less than $26,870,132.98.

### B.  Capital Funding Obtains a Receiver for Bellefield

19.     Capital Funding discovered that the Bellefield Property's physical condition and the safety of its residents suffered greatly due to Bellefield's, and its prior management's, neglect and failure to subsidize the ongoing Bellefield Property obligations.  Indeed, HUD had given the Bellefield Property a materially low score, the then insurer indicated it would no longer provide coverage, and the property manager intended to cease providing services as of January 31, 2025. The Bellefield Property's residents had also submitted a letter to HUD detailing water damage that had caused structural failures and additional safety concerns.

20.     By January 2025, the Bellefield Property's financial and physical condition had severely deteriorated, and Moshe Silber—Bellefield's principal—had pled guilty to conspiracy to defraud a financial institution in violation of 18 U.S.C. § 371 in *United States v. Silber*, 24-cr-446 (D.N.J. 2024) (the "Receivership Case").

21.     On January 31, 2025, Capital Funding filed a complaint (the "Complaint") against Bellefield in the United States District Court for the Western District of Pennsylvania (the "Receivership Court") seeking emergency appointment of a receiver as, *inter alia*, Bellefield had

ceased debt service, its principal was incarcerated, and the Bellefield Property's residents were at risk of losing critical services. A copy of the Complaint is attached as **Exhibit I**.

22.    On February 5, 2025, the Receivership Court entered the *Order Granting Emergency Application to Appoint Temporary Receiver* (the "Receivership Order"), appointing Ian Lagowitz of Trigild IVL, LLC as the Receiver for the Bellefield Property. A copy of the Receivership Order is attached as **Exhibit J**.

23.    The Receiver remains in place and, since his appointment, has transitioned property management services from Winn Companies to Lynd Property Management. *See* Receivership Case at Dkt. No. 18. He caused a comprehensive inspection of the Bellefield Property and requested quotes to remedy fire damage that had gone unaddressed for more than a year. *Id*. And he assessed the operative financial data, determining that the Bellefield Property had an outstanding balance of $582,652.50 in unpaid rent and several tenants had fallen out of certification for housing subsidies. *Id*.

24.    During the last nine (9) months, the Receiver has made substantial progress in stabilizing the Bellefield Property and overseeing several significant repairs, including a major pipe leak in the second-floor community room closet and the resulting water intrusion. *See* Receivership Case at Dkt. Nos. 18, 21, 29, 34, 37, 38, 39, 37. The Receiver repaired the Bellefield Property's compactor, replaced a broken pipe affecting residents' plumbing on the 6th and 7th floors, resolved a plumbing stack issue, and remedied a plumbing issue caused by grease buildup that affected multiple floors. *Id*. In addition, the Receiver has diligently worked to increase the Bellefield Property's marketability by hiring a landscaper and easing the administrative workload on the Bellefield Property's staff by acquiring a new Xerox copier. *Id*. To ensure the long-term

sustainability of the Bellefield Property and to remedy day-to-day maintenance issues, the Receiver hired a dedicated maintenance technician. *Id*.

25.     The Receiver has also made substantial progress remedying the Bellefield Property's regulatory and financial deficiencies.  The Receiver supervised the completion of Management and Occupancy Review responses through the Housing Authority and ensured completion of all required staff program trainings.  *See* Receivership Case at Dkt. No 21.  As a result, the Bellefield Property is now in good standing with the Housing Authority and has no lingering obligations to maintain compliance. *Id*.  The Receiver has ensured that no tenants have past-due recertifications, which has allowed residents to keep their housing subsidies.  *Id*.  Thanks to the Receiver's diligent efforts to recover past-due rent and subsidies, the outstanding obligations owed to the Bellefield Property have decreased from nearly $600,000 to approximately $75,000.  *See* Receivership Case at Dkt. No. 39.

26.     Moreover, the Receiver engaged Newmark, a nationally recognized real estate broker with specific expertise in HUD properties, to conduct a fulsome marketing process for the Bellefield Property.  *See Declaration of Ian Lagowitz in Support of Capital Funding LLC's Objection to Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition Financing, (ii) Granting Liens and Superpriority Administrative Expense Claims, (iii) Modifying the Automatic Stay, and (iv) Granting Related Relief* [Dkt. No. 48] (the "Lagowitz Declaration") at ¶¶ 9-10.  Specifically, the Receiver has been marketing the Bellefield Property for sale and has received ▮▮▮▮ bids or indications of interest for the Bellefield Property ranging from ▮▮▮▮ to ▮▮▮▮

▮▮▮▮     *Id*.  The Receiver was on the verge of selecting a winning bidder from one of the two

highest and best bids received and moving forward with closing a sale of the Bellefield Property

when these bankruptcy cases were filed.  *Id.*

27.     Upon information and belief, the Debtors did not properly coordinate with the

Receiver prior to filing Bellefield's bankruptcy case or give Capital Funding advance notice of the

bankruptcy.   And, as more fully stated in the Lagowitz Declaration, the Receiver believes

Bellefield should not be in bankruptcy and that the bankruptcy will harm Bellefield's stakeholders.

*Id*. at ¶ 12.  In particular, the Receiver has confirmed that he has substantial cash on hand (over

$750,000) to cover upcoming operating expenses and that the Bellefield Property is stable with an

occupancy rate of approximately 85%.   *Id*. at ¶ 8; Receiver Report at p. 6. The Receiver also

believes that the bankruptcy case will interfere with the ongoing sale process to the detriment of

Bellefield's stakeholders, while incurring unnecessary, wasteful, and duplicative professional fees.

Lagowtiz Decl. at ¶¶ 11-12.

28.     In the most recent financial report filed by the Receiver, a true and correct copy of

which is attached hereto as **Exhibit K** (the "<u>Receiver Report</u>"), Bellefield's property manager—

Lynd Management Group—stated that:

     a.  "The Resident Coordinator continues to provide valuable assistance and support to households, contributing to a positive resident experience. Additionally, monthly manager trainings are being held at Bellefield Dwellings, bringing together Pittsburgh area managers for hands-on, in-person learning and development.;"

     b.  "Maintenance continues to uphold property standards, focusing on building upkeep and unit turns. Compliance remains strong, with only one market renter on site, and all subsidy voucher payments were received and successfully posted to resident ledgers.;" and

     a.  "Overall, the property remains steady and well-positioned for continued success in the coming months."

Receiver Report at 12 of 107.

### C. **The Debtors Lack Authority to File Bankruptcy on Behalf of Bellefield**

29.     Bellefield's chapter 11 petition [Case No. 25-20493-MBK, Dkt. No. 1] was signed on behalf of Bellefield by LaPuma in her capacity as an independent fiduciary over Crown Capital Holdings LLC ("Crown") and certain other affiliated entities. *See* Case No. 25-20493-MBK, Dkt. No. 1 at 4.

30.     However, according to that certain *Limited Liability Company Agreement of Bellefield Dwellings Apts LLC*, effective April 21, 2022, a true and correct copy of which is attached as **Exhibit L** (the "LLC Agreement"), Bellefield Dwellings Apts MM LLC (the "Managing Member") is the managing member of Bellefield.  *See* LLC Agreement at Preamble. The LLC Agreement provides:

> The business and affairs of the Company shall be managed ***exclusively*** by the Managing Member, ***and no other Member shall have any managerial authority or other right to control any aspect of the operations or activities of the Company***. The Managing Member is authorized to execute any and all documents on behalf of the Company necessary or appropriate in connection with the acquisition, financing, operation, management or development of the business and any property of the Company.

LLC Agreement at ¶ 6 (emphasis added).  The LLC Agreement does not provide a mechanism for the removal of the Managing Member or amendment of the LLC Agreement.  *See generally* LLC Agreement.[5]

31.     According to the LLC Agreement, Mr. Moshe Silber is the sole member of the Managing Member.  This is further corroborated by Bellefield's Organizational Flow Chart, a true

---

[5] The Receivership Order may also grant the Receiver authority to file bankruptcy on behalf of Bellefield. *See* Receivership Order ¶ 8(d) (granting the Receiver authority to defend or commence any lawsuit with regard to the Bellefield Property); ¶ 16 (prohibiting any individual or entity from initiating any legal action against the Receiver with respect to the Bellefield Property).  In any case, Capital Funding reserves all rights as to which party between the Managing Member and the Receiver holds the authority to file bankruptcy on behalf of Bellefield, but asserts that LaPuma lacks such authority.

and correct copy of which is attached hereto as **Exhibit M** (the "Org Chart"), prepared in connection with the Loan Agreement.[6]

32.     In response to Capital Funding's request for documents evidencing the Debtors' authority to file Bellefield's chapter 11 case, the Debtors provided that certain *Omnibus Written Consents of the Members*, dated October 5, 2025, a true and correct copy of which is attached as **Exhibit N** (the "Consent"). The Consent purports to appoint CBRM Realty Inc. as "the sole and exclusive agent of each of . . . the Member Managed Entities [including Bellefield], without any further action by any person." *See* Consent at p. 3. However, the Consent is only executed by LaPuma on behalf of each of Bellefield's non-managing members, while it is not executed by Bellefield's Managing Member. *See generally* Consent.

33.     Upon information and belief, Mr. Silber—who controls the Managing Member— did not consent to or authorize Bellefield's bankruptcy filing.

### D.  The Pending Bankruptcy Cases

34.     On May 19, 2025, and August 17, 2025, CBRM Realty Inc. ("CBRM"), Crown, and certain of their affiliates (collectively, the "Initial Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing their respective chapter 11 cases, which were jointly administered under the case styled *In re CBRM Realty Inc.*, Case No. 25-15343 (Bankr. D. N.J. May 19, 2025).

35.     On October 5, 2025 and October 6, 2025, Bellefield and forty-one (41) other entities (the "Debtors") each filed petitions for relief under chapter 11 of title 11 of the United

---

[6] Notably, the Debtors provided an amended organizational chart that does not align with the Org Chart provided to Capital Funding in connection with the Loan. A copy of the Debtors' organizational chart is attached hereto as **Exhibit O** (the "Alternate Org Chart"). However, while the identity of certain members of Bellefield are different in the Alternate Org Chart, the managing member of Bellefield remains the same and Mr. Silber is listed as the 100% owner of the managing member. Accordingly, even if the Alternate Org Chart is accurate, Mr. Silber would have needed to consent to the bankruptcy; the change of the other members would not affect the exclusive right of the managing member to control Bellefield.

States Code (the "<u>Bankruptcy Code</u>").  The Debtors cases are being jointly administered under the case styled *In re Crown Capital Holdings LLC*, Case No. 25-15321-MBK (Bankr. D. N.J Oct.  5, 2025).

36.    On October 6, 2025, the Debtors filed the *Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition Financing, (ii) Granting Liens and Superpriority Administrative Expense Claims, (iii) Modifying the Automatic Stay, and (iv) Granting Related Relief* [Dkt. No. 13] (the "<u>DIP Motion</u>"), which attaches that certain *Binding Term Sheet for Senior Secured, Superpriority Debtor-in-Possession Financing*, dated as of October 1, 2025, as Exhibit A to the DIP Motion (the "<u>Term Sheet</u>").  The DIP Motion seeks approval of, among other things, a $21,910,861.29 priming DIP loan facility secured by substantially all of the Debtors' assets.  If approved, the DIP loan, Term Sheet and Interim DIP Order (as defined below) would also, *inter alia*,

   i.    grant Nexus DIP Financing LLC (the "<u>DIP Lender</u>") allowed superpriority administrative expense claims (the "<u>DIP Superpriority Claims</u>") against the Debtors' estates with priority over any and all other administrative expense claims of any kind (*see* Ex. B to the DIP Motion (the "<u>Interim DIP Order</u>") at ¶¶ 6, 7(f));

   ii.   grant priming liens to the DIP Lender (the "<u>DIP Liens</u>") which are unavoidable and which would maintain the priority granted ***even if*** a Bellefield's chapter 11 case is dismissed, converted or the Interim DIP Order is reversed or modified on appeal (*see* Interim DIP Order at ¶¶ 7(f), 21); and

   iii.  provide that the DIP Lender will be granted a priming DIP Lien against each Debtor to the extent of (1) the portion of the DIP facility provided to such debtor for capital expenditures, operational expenses or adequate protection payments, and (2) any portion of the DIP facility used for general chapter 11 administrative expenses (*see* DIP Motion at pp. 5-6).  This would amount to over $9 million in additional financing which would prime existing interests on Bellefield's assets.

Moreover, the Term Sheet indicates that the DIP Lender will credit bid "a portion of the outstanding DIP Loan obligations to purchase the Properties identified as Group A on Schedule 2," which includes Bellefield (the "<u>Stalking Horse Acquired Assets</u>").  Per the Term Sheet, the

consideration for the purchase of the Stalking Horse Acquired Assets consists of (a) the credit bid of *a portion* of the DIP obligations, and (b) the illusory "assumption" of certain liabilities that are "senior to the DIP Facility," which do *not* include Capital Funding's Loan (or, apparently, any other liabilities) as the DIP Facility is a priming loan. *See* Term Sheet at p. 2–3.[7]  Accordingly, the DIP Motion and Term Sheet appear to be simply a mechanism through which the DIP Lender can acquire certain properties, including the Bellefield Property, at a discount while converting existing senior secured lenders, such as Capital Funding, to unsecured creditors.

37.    On October 9, 2025, Capital Funding filed its *Objection to Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition Financing, (ii) Granting Liens and Superpriority Administrative Expense Claims, (iii) Modifying the Automatic Stay, and (iv) Granting Related Relief* [Dkt. No. 53] (the "DIP Objection"), arguing that, *inter alia*, (i) the case was filed without corporate authority, (ii) Capital Funding was not adequately protected under the terms proposed by the DIP Motion and Term Sheet, (iii) Capital Funding does not need additional liquidity to continue operating as a going concern, and (iv) under applicable law, the rents generated from the Bellefield Property are not property of the Debtors' estates as they have been absolutely, unconditionally and irrevocably assigned to Capital Funding.

38.    The interim hearing on the DIP Motion was scheduled for October 9, 2025, at 1:30 p.m. (prevailing Eastern Time) but was continued to October 23, 2025 at 11:30 a.m. (prevailing Eastern Time).  Notably, in continuing the DIP hearing without seeking approval of *any* portion of the interim financing, the Debtors effectively admitted that *none* of the

---

[7] Specifically, the term sheet states that the stalking horse would assume "each administrative claim, priority claim, and secured claim *that is senior to the DIP Facility* not paid in full in cash by the Group A Stalking Horse Bidder as of the closing date and as otherwise expressly provided in the Group A Stalking Horse Transaction Agreement."

$6,450,187.23 of interim financing that was allegedly needed to stave off an emergency was actually needed at that time.[8]

39.     The DIP Objection and the arguments set forth therein are fully incorporated herein by reference.

## **ARGUMENT**

40.     Bellefield's bankruptcy case should be dismissed as it was filed without proper corporate authority.  Alternatively, given the success of the receivership and the Receiver's proximity to consummating a value maximizing sale after a fulsome marketing process, the Court should abstain from exercising jurisdiction over Bellefield.  If the Court determines not to dismiss Bellefield's bankruptcy case or abstain from exercising jurisdiction, the Court should lift the automatic stay to allow the Receiver to consummate a sale of the Bellefield Property as (i) Capital Funding would not be adequately protected in the bankruptcy proceeding, (ii) there is no equity in the Bellefield Property, and (iii) the Bellefield Property is not necessary for a successful reorganization.  Moreover, the Receiver should be excused from complying with the turnover requirements of section 543 of the Bankruptcy Code as complying with section 543 of the Bankruptcy Code would prejudice Bellefield's existing creditors and would result in substantial duplication of efforts, delay and confusion.

**A. Bellefield's bankruptcy case should be dismissed as it was filed without proper corporate authority.**

41.     The filing of a bankruptcy petition "is a specific act requiring specific authorization." *In re N2N Commerce, Inc.*, 405 B.R. 34, 41 (Bankr. D. Mass. 2009). It is well-settled that applicable state law determines whether a bankruptcy filing was authorized. *See Price*

---

[8] "Having engaged with those parties and received information from many of those parties, the debtors now believe that approval of the DIP financing at this point is premature and we believe we can have funding of these cases for at least the interim period of time on a cash collateral basis."  Tr. of H'rg dated Oct. 9, 2025 at 9:25-10:4.

*v. Gurney,* 324 U.S. 100, 106 (1945) (holding that those "who purport to act on behalf of the corporation" must have "been granted authority by local law to institute the proceedings"). "The United States Supreme Court holds that, with respect to corporations, the entity vested with 'the power of management' has the requisite authority to file a bankruptcy petition." *In re 3P Hightstown, LLC,* 631 B.R. 205, 209−10 (Bankr. D. N.J. 2021) (*citing Price,* 324 U.S. at 104). "If a bankruptcy petition is filed by an entity lacking the 'power of management' in the corporate context, 'the bankruptcy case must be dismissed for want of legal authority to do so.'" *Id.* (*citing In re Advanced Vascular Res. of Johnstown, LLC,* 590 B.R. 689, 691 (Bankr. W.D. Pa. 2018)). "This precept of law operates in all corporate cases, including in those cases filed by a limited liability company." *Id.* (*citing In re Advanced Vascular,* 590 B.R. at 691).

42.  Here, Bellefield's bankruptcy petition was filed without requisite corporate authority and should therefore be dismissed.  Per the LLC Agreement, the Managing Member was appointed managing member of Bellefield.  *See* LLC Agreement at Preamble.  The LLC Agreement provides:

> The business and affairs of the Company shall be managed ***exclusively*** by the Managing Member, ***and no other Member shall have any managerial authority or other right to control any aspect of the operations or activities of the Company***. The Managing Member is authorized to execute any and all documents on behalf of the Company necessary or appropriate in connection with the acquisition, financing, operation, management or development of the business and any property of the Company.

LLC Agreement at ¶ 6 (emphasis added).  The LLC Agreement does not provide a mechanism for the removal of the Managing Member or amendment of the LLC Agreement.  *See generally* LLC Agreement.  Delaware law provides that, when a limited liability company agreement is silent as to how it may be amended, "the limited liability company agreement may be amended with the approval of all of the members . . ."  Del. Code Ann. tit. 6, § 18-302 (f).

43.     Here, the Managing Member is 100% owned and managed by Moshe Silber.  *See* MM LLC Agreement attached as **Exhibit P** at ¶ 5.  Neither Mr. Silber nor the Managing Member appear to have consented to an amendment of the LLC Agreement to remove the Managing Member as managing member.  In response to a request for documents evidencing the Debtors' authority to file Bellefield's chapter 11 case, the Debtors provided the Consent, which purports to appoint CBRM Realty Inc. as "the sole and exclusive agent of each of . . . the Member Managed Entities [including Bellefield], without any further action by any person."  *See* Consent at p. 3. However, the Consent is only executed by LaPuma on behalf of each of Bellefield's non-managing members, but was not executed by the Managing Member whose consent is required.  *See generally* Consent.  Therefore, under Delaware Law, the LLC Agreement was not properly amended to remove the Managing Member. *See* (*Barraso, et a. v. Vasallo TV Grp. LLC, et al.*, No. 2025-0480-LWW, 2025 WL 2887262, at *11 (Del. Ch. Oct. 10, 2025) (holding actions taken contrary to LLC agreement were void without being legally validated). The Managing Member remains the entity with exclusive authority to manage Bellefield under the terms of the LLC Agreement, and the Debtors and LaPuma lack authority to place Bellefield into bankruptcy. Accordingly, LaPuma did not have authority to execute Bellefield's chapter 11 petition under applicable law, and Bellefield's bankruptcy proceeding should be dismissed.

**B. Alternatively, the Court should abstain from exercising jurisdiction over Bellefield.**

44.     Alternatively, the Court should exercise its discretion and abstain from assuming jurisdiction over Bellefield.  Section 305(a) of the Bankruptcy Code permits a bankruptcy court to dismiss or suspend proceedings in a pending case and states:

> The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if ... the interests of creditors and the debtor would be better served by such dismissal or suspension.

17

11 U.S.C. § 305(a)(1).  The decision to dismiss or suspend under section 305(a) is discretionary and must be made on a case-by-case basis. *In re A & D Care, Inc.*, 90 B.R. 138, 141 (Bankr. W.D. Pa. 1988).  Courts in this circuit look to the totality of the circumstances and a broad range of factors when analyzing whether dismissal or abstention under section 305(a)(1) of the Bankruptcy Code is appropriate.  *See In re SA Hosp. Acquisition Grp.*, 660 B.R. 97, 114 (D. Del. 2024).  The non-exhaustive list of factors that courts in this circuit analyze in determining whether abstention is merited include:

    i.    efficiency and economy of administration and avoiding an unnecessary duplication of efforts and a waste of time and resources;

    ii.    whether an alternative means is available for achieving an equitable distribution of the assets;

    iii.    whether the non-bankruptcy insolvency proceeding has advanced so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process;

    iv.    whether bankruptcy proceedings are necessary to reach a just and equitable solution;

    v.    the lack of any advantage to creditors by invoking federal bankruptcy jurisdiction and/or the lack of prejudice to parties resulting from abstention and dismissal;

    vi.    the existence of minimal assets to administer; and

    vii.    the motivation and/or purpose of the parties seeking to invoke federal bankruptcy jurisdiction.

*Id*.  Here, each of these factors weighs in favor of abstention.

    45.    <u>Factor #1 – Efficiency and Economy of Administration</u>.  The efficiency and economy of administration would be best served by the Court abstaining from exercising jurisdiction over this proceeding.  Since his retention, the Receiver has undertaken a substantial marketing process, coordinated by Newmark, in furtherance of a sale of the Bellefield Property. *See* Lagowitz Decl. at ¶¶ 9-10.  Newmark contacted over 14,000 potential purchasers for the Bellefield Property and received ███████████ offers or letters of interest ranging from ██████

████ to ████████████████████████████████████████. *Id.* The Receiver has

narrowed down the bids to two finalists—████████████████████████████████

████████—and was on the verge of selecting a winning bidder and moving forward with a

sale of the Bellefield Property. *Id.* If Bellefield remains in bankruptcy, all of this time and effort

would have been wasted, as the Debtors would need to restart the marketing process from scratch,

which would be an enormous waste of resources, particularly because the offers received by the

Receiver for the Bellefield Property would be ████████████████████████████

████. *See, e.g.*, *In re SA Hosp. Acquisition Grp.*, 660 B.R. 97, 114–17 (D. Del. 2024) (finding

that a receiver's significant prepetition marketing process and efforts toward a sales of a borrower's

assets weighed in favor of abstention). Moreover, there would be significant confusion and

duplication of efforts if the Receiver were forced to cede control of Bellefield to the Debtors as

the Debtors would need to get up to speed on Bellefield, its business, the Bellefield Property and

each of their respective statuses and needs.

46. Moreover, if Bellefield remains in bankruptcy, the Debtors intend to burden

Bellefield with the financing facility contemplated by the DIP Motion, which seeks to **prime**

Capital Funding's senior liens in an amount of at least **$9 million**, notwithstanding that it appears

that Capital Funding is already undersecured. *See generally* DIP Motion; *see* Interim DIP Order

at ¶¶ 7(f), 21.

47. The Debtors and DIP Lenders intend to use the contemplated postpetition financing

as a stalking horse credit bid—with no cash consideration—which would result in Capital Funding

receiving nothing on account of its prepetition secured claim. Capital Funding would strenuously

oppose these efforts, particularly because, as set forth in the DIP Objection, Bellefield has no need

for additional financing and the Debtors cannot meet their burden to obtain such financing under

the Bankruptcy Code.  *See, e.g.*, DIP Objection at ¶ 3.  Litigation over the propriety of the proposed priming DIP facility and corollary stalking horse credit bid would be value destructive, both for the Debtors and Capital Funding.

48.    Indeed, a large portion of the DIP would be used to pay ***millions*** of dollars of unnecessary, wasteful, and duplicative professional fees for services that the Receiver and Newmark are already performing admirably.

49.    Accordingly, this factor weighs in favor of abstention.

50.    <u>Factor # 2 – Alternative Means of Achieving Equitable Distribution of Assets</u>.  The pending receivership provides a means for an equitable distribution of Bellefield's assets.  The proceeds from a receiver sale will be distributed in substantially the same order as directed under section 507 of the Bankruptcy Code.  Any receiver sale must be approved by the Receivership Court and conducted according to the procedures set forth in 28 U.S.C. § 2001 *et seq.*  Pursuant to the sale order, the proceeds of a receiver sale would first be used to pay administrative expenses, including closing costs and the receiver's fees.  *See Globe Solvents v. Nouskhajian*, 25 A.2d 595, 597 (Pa. Super. Ct. 1942) (holding administrative expenses will be paid first).  Next, creditors will be paid from the sale proceeds based on the order and priority of their claims.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Lenox Temple LLC*, No. 19CV17615, 2021 WL 7906209, at *4 (D. N.J. Apr. 7, 2021) ("[T]he Receiver shall deposit any surplus proceeds with the Court, which shall be distributed by the Court, upon application of any [creditor], in accordance with the amount and priority of the liens . . . .").  Any remaining funds would be returned to the debtor or its equity holders.  *See In re Muir*, 212 F. 495, 504 (M.D. Pa. 1914).  Accordingly, the receivership already provides a process for the equitable distribution of Bellefield's assets, overseen and monitored by the Receivership Court.

51.    Factor # 3 – Advanced Non-Bankruptcy Insolvency Proceedings.  The receivership is in its advanced stages and therefore this factor also weighs in favor of abstention.  Since his appointment over nine (9) months ago, the Receiver has (i) transitioned the Bellefield Property to a more competent management company, (ii) remedied damage to the Bellefield Property and rectified health and safety issues, (iii) collected hundreds of thousands of dollars of accounts receivable owing to Bellefield, (iv) remedied regulatory and financial deficiencies with HUD, (v) assisted tenants with past-due recertifications required by HUD, and (vi) overseen the marketing process discussed herein.  *See Supra* at ¶¶ 24-27.

52.    The Receiver was on the precipice of completing a sale of substantially all of Bellefield's assets, distributing the sale proceeds to creditors, and taking steps to wind down the receivership when Bellefield's chapter 11 petition was filed.  Lagowitz Decl. at ¶ 10.  At bottom, Bellefield was on solid footing and was nearing paying its creditors from Bellefield's sale proceeds.  Accordingly, this factor also weighs in favor of abstention.

53.    Factor # 4 – Necessity of Bankruptcy Proceeding.  Bellefield's bankruptcy proceeding is not necessary.  As discussed, over the preceding nine (9) months, the Receiver has stabilized the Bellefield Property, marshalled Bellefield's assets, and run a fulsome marketing process.  *See Supra* at ¶¶ 24-27.  Bellefield has more than $750,000 cash on hand, which is more than sufficient to allow the Receiver to monetize Bellefield's assets, distribute the proceeds thereof to creditors in accordance with their relative priorities, and wind down the receivership.  *Id*. Bellefield has been paying its post-receivership debts as they come due and does not have significant litigation pending that would warrant the imposition of the automatic stay. Accordingly, bankruptcy provides no benefit to Bellefield, while causing substantial and irreparable harm.

54.    <u>Factor # 5 – Lack of Advantage to Creditors and Prejudice to Parties</u>.  If the Court

exercises jurisdiction over Bellefield's assets in this bankruptcy case, there will be no advantage

to creditors, including Capital Funding, and instead Bellefield's creditors would be significantly

prejudiced.  Capital Funding is Bellefield's senior secured lender with a lien on substantially all

of Bellefield's assets, and who is currently owed not less than $26.8 million on account of

Bellefield's obligations.  The Receiver contacted more than 14,000 parties to garner interest in

purchasing the Bellefield Property and received ▆▆▆▆▆ bids or indications of interest, the

highest of which was ▆▆▆▆▆ Lagowitz Decl. at ¶¶ 9-10.  Accordingly, ▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ The

bankruptcy is not necessary to pursue the stalking horse bid, as the stalking horse bidder has been

invited to participate in the Receivership sale process.  Importantly, any sale of the Bellefield

Property will need to be approved by the Receivership Court prior to consummation, and the

Receivership Court will also approve distributions from the sale proceeds to Bellefield's creditors.

Other Bellefield creditors will have an opportunity to review and challenge the propriety of any

proposed sale or distribution of the sale proceeds.

55.    In contrast, if this Court exercises jurisdiction over Bellefield, the Debtors will seek

to prime existing Bellefield creditors in the amount of at least $9 million pursuant to the proposed

DIP facility.  Moreover, the Debtors are proposing to consummate a stalking horse transaction that

consists entirely of a credit bid by the DIP Lender, with no cash component, which is substantially

worse than the bids generated by the Receiver and Newmark.  Simply put, if this Court does not

abstain, the Debtors' preferred path would likely ensure that creditors of Bellefield receive

substantially less than they would in the Receivership. Accordingly, this factor also weighs in favor of abstention.

56.     Factor # 6 – Minimal Assets to Administer. Bellefield has few assets that need administration, as its primary asset is the Bellefield Property and its other assets largely consist of (i) cash in the control of the Receiver, and (ii) office furniture, supplies and fixtures at the Bellefield Property. The Receiver has already been effectively administering these assets, and accordingly this factor also weighs in favor of abstention. *See In re SA Hosp. Acquisition Grp.*, 660 B.R. 97, 114–17 (D. Del. 2024) (finding that when a receiver was administering a business whose assets were primarily located in a single jurisdiction, this weighed in favor of abstention).

57.     Factor # 7 –  Motivation or Purpose of Parties Seeking to Invoke Bankruptcy Jurisdiction. As discussed, Bellefield and the Bellefield Property have stabilized and are currently operating safely and efficiently while the Receiver oversees the conclusion of the sale process for the Bellefield Property. *See Supra* at ¶¶ 24-27. Bellefield does not need postpetition financing or the protection of the automatic stay, and was nearing the successful conclusion of the receivership through a court approved sale. *Id.* Accordingly, the primary motive for filing Bellefield's bankruptcy petition appears to be providing additional assets to support the Debtors' proposed priming DIP facility—which Bellefield does not need—in furtherance of the stalking horse credit bid that is substantially worse than the bids received by the Receiver and Newmark. Accordingly, this factor also weighs in favor of abstention.

**C. Alternatively, the Court should lift the automatic stay to allow the Receiver to consummate a sale of the Bellefield Property.**

58.     If the Court determines to not dismiss Bellefield's bankruptcy case or abstain from exercising jurisdiction over Bellefield, the Court should lift the automatic stay to allow the

Receiver to consummate a sale of the Bellefield Property.  Section 362(d) of the Bankruptcy Code

provides:

> On request of a party in interest and after notice and a hearing, the court shall grant
> relief from the stay provided under subsection (a) of this section, such as by
> terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in
> > property of such party in interest;
> > (2) with respect to a stay of an act against property under subsection (a) of
> > this section, if—
> > (A) the debtor does not have an equity in such property; and
> > (B) such property is not necessary to an effective reorganization;

11 U.S.C. § 362(d).  Here, Capital Funding would not be adequately protected in a Bellefield

bankruptcy proceeding, there is no equity in the Bellefield Property, and the Bellefield Property is

not necessary for a successful reorganization.

59.     As an initial matter, the Debtors cannot adequately protect Capital Funding under

the circumstances.  While adequate protection is not expressly defined in the Bankruptcy Code,

"section 361 states that it may be provided by (1) periodic cash payments; (2) additional or

replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured

creditor's interest in such property."  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564

(3d Cir. 1994).  Whether adequate protection exists is a determination made on a case-by-case

basis.  *Id.*

60.     In order for adequate protection to exist, "the prepetition creditor must be provided

with the same level of protection it would have had absent the post-petition financing since it is

entitled to retain the benefit of its prebankruptcy bargain."  *In re Stoney Creek Techs., LLC*,

364 B.R. 882, 890 (Bankr. E.D. Pa. 2007); *see also In re Swedeland*, 16 F.3d at 564 (holding that

adequate protection "should provide the pre-petition secured creditor with the same level of

protection it would have had if there had not been post-petition superpriority financing"); *In re*

24

*O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987) ("The whole purpose in providing adequate protection for a creditor is to ensure that the creditor receives the value for which the creditor bargained prebankruptcy."); *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 749 (Bankr. S.D. Fla. 2010) ("[E]nsuring that a creditor receives the value for which it bargained before the debtor had filed for bankruptcy is the principle's *raison d'être*.").

61.     More often than not, courts will look to "the presence or absence of an equity cushion" in determining whether adequate protection exists. *Matter of Cardell*, 88 B.R. 627, 632 (Bankr. D.N.J. 1988). While the existence of an equity cushion can be sufficient for a showing of adequate protection, it is "only one factor in determining whether the creditor's interest is adequately protected." *In re Pannell*, 12 B.R. 51, 54 (Bankr. E.D. Pa. 1981); *see also In re Colrud*, 45 B.R. at 177 ("[E]quitable considerations other than the equity cushion must [also] be taken into account in determining if the creditor is adequately protected."). Just as adequate protection is determined on a case-by-case basis, "equitable considerations, *arising from the facts of each case*, should be examined." *In re Callister*, 15 B.R. 521, 530 (Bankr. D. Utah 1981) (emphasis added). This goes for equity cushions as well. *See In re Tucker*, 5 B.R. 180, 183 (Bankr. S.D.N.Y. 1980) ("[T]he adequacy of an equity cushion, stated either as a dollar amount or as a percentage of the estimated fair market value of the property, must ultimately be determined upon equitable considerations arising from the particular facts of each proceeding."). As explained in *In re Tucker*, "the amount of an equity cushion which may be adequate protection . . . in one case, may be insufficient to constitute adequate protection . . . in another case." *Id.* at 183. It is well settled that a cushion of at least 20% is required in order to constitute adequate protection. *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 306 (Bankr. D. Del. 2011).

62.     Here, Capital Funding is not adequately protected.  In the months preceding the Petition Date, the Receiver and Newmark ran a fulsome marketing process for the Bellefield Property, receiving ███████████ bids or indications of interest for the Bellefield Property.  *See* Lagowitz Decl. at ¶¶ 9-10.  However, █████████████████████████████████

███████████████████████ *Id*.  Moreover, the proposed stalking horse bid is for even less than the bids received by the Receiver and is further evidence that there is no equity cushion here to adequately protect Capital Funding.  Each dollar of additional debt layered on top of what Capital Funding is owed impairs Capital Funding's position by an equal amount with little likelihood that bids will come in for the Bellefield Property at a level to put Capital Funding in the same position that it held as of the Petition Date given the Receiver's extensive prepetition marketing of the Bellefield Property.

63.     Further, the DIP facility contemplated by the DIP Motion is effectively a stalking horse credit bid for certain properties of the Debtors, including the Bellefield Property, the terms of which are outlined in the Term Sheet.  *See* Term Sheet at pp. 2-3.  The DIP Lender's stalking horse bid for the Group A properties, which includes the Bellefield Property, includes ***no*** cash component and indicates that the DIP Lender is only contemplating (a) credit bidding "a portion of the outstanding DIP Loan obligations to purchase the Properties [including the Bellefield Property]" and (b) the illusory "assumption" of certain liabilities that are "senior to the DIP Facility," which do ***not*** include Capital Funding's Loan (or, apparently, any other liabilities) as the DIP Facility is a priming loan.  *See* Term Sheet at p. 2–3.[9]

---

[9] Specifically, the term sheet states that the stalking horse would assume "each administrative claim, priority claim, and secured claim ***that is senior to the DIP Facility*** not paid in full in cash by the Group A Stalking Horse Bidder as of the closing date and as otherwise expressly provided in the Group A Stalking Horse Transaction Agreement."

64.     The DIP facility and the priming of Capital Funding's liens is effectively a surcharge of Capital Funding's collateral intended to transfer the Bellefield Property to the DIP Lender and wipe out Capital Funding's secured position, and without the required showing under section 506(c) of the Bankruptcy Code.[10]   And the Term Sheet expressly contemplates the potentiality that the Debtors' estates may end up administratively insolvent, casting doubt on the value of any claim Capital Funding could assert under section 507(b) of the Bankruptcy Code.  *See* Term Sheet at pp. 12–13.

65.     Moreover, (i) given that Capital Funding is objecting to entry of the Interim DIP Order, the Debtors are not proposing to pay adequate protection payments to Capital Funding during these bankruptcy cases, and (ii) the only other adequate protection that the Debtors are offering is replacement liens on Capital Funding's current collateral, and replacement liens on the Debtors' unencumbered assets, which appear to consist primarily, if not entirely, of litigation claims.  *See* DIP Motion at ¶ 16.

66.     Replacement liens on collateral that a lender already has a lien on is illusory.  *In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 WL 671761, at *3 (Bankr. D. Del. Feb. 18, 2011) ("Providing [a secured creditor] replacement lien on assets against which [it] already has a lien is illusory.").  The other collateral the Debtors are offering is of unknown and speculative value, consisting of untested litigation claims against a former insider of the Debtors and certain entities under his control.  *See* DIP Motion at ¶ 16.  But the primary target of this litigation—Moshe Silber—is incarcerated and recently filed a chapter 7 bankruptcy petition of his own. *See In re Moshe Silber*, Case No. 25-22890-SHL (Bankr. S.D.N.Y. Sept. 19, 2025).  Moreover, any recovery

---

[10] Under the terms of the proposed final DIP order, the DIP Lender would receive a 506(c) surcharge waiver and a waiver of the equities of the case exception, benefits which the prepetition secured lenders will not receive.  *See* Interim DIP Order at ¶ 26.

would, presumably, need to be split with other Debtors' estates, making it unclear what portion, if any, would be available for Bellefield.  Accordingly, even if the Debtors are successful in any litigation against Mr. Silber or other entities, the collectability of any judgment against them, and Bellefield's proportionate share of such recovery, is speculative at best.

67.     Moreover, the sale process run by the Receiver conclusively establishes that there is likely no equity in the Bellefield Property (Bellefield's only significant asset), as the highest bid received was for ▮▮▮▮▮▮ while Capital Funding is owed approximately $26.8 million.

68.     Moreover, the Bellefield Property is not necessary for a successful reorganization, as the Debtors intend to conduct a marketing and sale process for, among other properties, the Bellefield Property.  *See, e.g.*, *Declaration of Matthew Dundon in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 21] at ¶ 28 ("The DIP Facility will provide the Debtors with a vital infusion of capital to pursue a marketing process for the 19 properties listed in Schedule 2 of the DIP Term Sheet, [including the Bellefield Property . . .").  Given the lack of equity and the Debtors' intent to liquidate, the Bellefield bankruptcy will only burden the Debtors' estates with additional unnecessary, wasteful, and duplicative administrative costs while delaying a recovery to Bellefield's creditors.  Accordingly, stay relief is warranted.

**D.  The Court should waive the turnover requirements of section 543 of the Bankruptcy Code for cause.**

69.     Cause also exists under Bankruptcy Code section 543(d) to excuse the Receiver's compliance with sections 543(a) and (b) of the Bankruptcy Code.  Section 543 of the Bankruptcy Code requires, among other things, a receiver to turnover possession, custody and control of the debtor's property to the debtor. *See* 11 U.S.C. § 543. Courts have recognized that "receivers are 'custodians' within the meaning of the Bankruptcy Code" and are therefore subject to section 543's turnover requirements. *In re 245 Associates, LLC*, 188 B.R. 743, 748 (Bankr. S.D.N.Y. 1995),

corrected (Nov. 9, 1995) (citing 11 U.S.C. § 101(11)(A)).  The burden of proof in a turnover proceeding rests on the party seeking turnover. *Maggio v. Zeitz*, 333 U.S. 56, 60 (1948).

70.    Section 543(d) of the Bankruptcy Code provides that "after notice and hearing, the bankruptcy court may excuse compliance with subsections (a), (b), or (c) of this section if the interests of creditors . . . would be better served by permitting a custodian to continue in possession, custody, or control of such property."  11 U.S.C. § 543(d)(1).

71.    The central inquiry under section 543(d) is whether requiring the turnover of the property is in the "interests of all the debtor's creditors." *In re Constable Plaza Associates, L.P.*, 125 B.R. 98, 103 (Bankr. S.D.N.Y. 1991). The Bankruptcy Code does not define what "interests of creditors" means, but bankruptcy courts have formulated a list of relevant factors to consider, including: (a) whether there will be sufficient income to fund a successful reorganization; (b) whether the debtor will use the turnover property for the benefit of the creditors; (c) whether there has been mismanagement by the debtor; and (d) whether or not there are preference issues which a receiver is not empowered to avoid. *See In re Lizeric Realty Corp.*, 188 B.R. 499, 506–07 (Bankr. S.D.N.Y. 1995), as amended (Nov. 28, 1995); *In re CCN Realty Corp.*, 19 B.R. 526 (Bankr. S.D.N.Y. 1982).

72.    This inquiry is fact intensive, turning upon whether the assets of the particular debtor should be administered by the existing custodian or returned to the debtor. *See, e.g., In re Dill*, 163 B.R. 221 (E.D.N.Y. 1994). Courts consider factors including whether there will be sufficient income to fund a successful reorganization and whether there has been mismanagement by the debtor. *In re Uno Broad. Corp.*, 167 B.R. 189, 200–02 (Bankr. D. Ariz. 1994).  The interests of the debtor are not a relevant consideration under this standard. *See* 4 *Collier on Bankruptcy*,

¶ 543.05 at 543–12 (15th Ed. 1993) ("[S]ection 543(d)(1) does not require an analysis of the interests of the debtor.").

73.     Here, the interests of Bellefield's creditors would be best served by waiving the turnover requirement of section 543 of the Bankruptcy Code as to the Receiver.  As discussed herein, Bellefield has sufficient cash to maintain operations for the foreseeable future, but this may not be the case if the Receiver is required to turnover the funds in its possession to the Debtors, who would likely use such funds to support the administration of other Debtors who are currently in a more dire position.  This cash should remain segregated from the funds of other Debtors so that it is easily identifiable to ensure it is used to benefit Bellefield's creditors and not creditors of other Debtors.  Moreover, the Receiver has been successfully managing Bellefield for nine (9) months, and requiring the Receiver to turnover Bellefield, its business operations, and the Bellefield Property to the Debtors would result in a disruption that would be deleterious to Bellefield's estate.

74.     The present circumstances are not unlike those found in *In re Uno Broad. Corp*, where a receiver had been appointed prior to a bankruptcy proceeding because, *inter alia*, it was in default under its obligations to a senior lender and the debtor's principal was incarcerated and thus unable to manage the business.  167 B.R. 189 (Bankr. D. Ariz. 1994).  After a party placed the debtor into bankruptcy, there was a dispute over whether the bankruptcy petition was filed with requisite corporate authority.  *Id*. at 192-93.  The *Uno* court declined to dismiss the case as having been filed without authority but waived the turnover requirement as to the receiver because, *inter alia*, (i) the receiver had been proceeding expeditiously and professionally in managing the affairs of the debtor, (ii) the receiver was experienced in the debtor's industry, and (iii) the alternative was to cede control of the debtor to another third party—not pre-existing management—which

"would undoubtedly [cause] substantial disruption, duplication, costs, and confusion arising out of another management change at this point." *Id*. at 201.

75.    The same is true here—the Receiver has been successfully managing and stabilizing Bellefield's assets and business for more than nine (9) months, has experience in Bellefield's industry, and there would be substantial disruption, duplication, costs and confusion were the Receiver required to turnover Bellefield, its operations, and assets to the Debtors at this time. *Id*. Accordingly, Capital Funding asserts that waiver of the turnover requirements of section 543 of the Bankruptcy Code is warranted.

## **WAIVER OF MEMORANDUM OF LAW**

76.    Capital Funding respectfully requests the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which Capital Funding relies is set forth in this Motion and does not raise any novel issues of law.

## **REQUEST FOR WAIVER OF STAY UNDER BANKRUPTCY RULE 4001**

77.    Capital Funding requests a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rules 4001(a)(4). As set forth above, (i) Bellefield's bankruptcy case was filed without corporate authority, and (ii) there is otherwise good cause for the Court to abstain from exercising jurisdiction over Bellefield's bankruptcy case. The Receiver of Bellefield was on the precipice of consummating a sale of substantially all of Bellefield's assets after a lengthy and thorough marketing process, which sale process has now been stayed by the filing of Bellefield's bankruptcy case. The stay of the sale process at this critical juncture risks undoing all of the hard work that the Receiver and its real estate broker, Newmark, have performed over the preceding nine (9) months. Accordingly, time is of the essence to prevent the improper

filing of Bellefield's bankruptcy proceeding from causing irreparable harm to Bellefield and its creditors.

## **RESERVATION OF RIGHTS**

78.    Capital Funding expressly reserves its right to amend or supplement this Motion, to introduce evidence supporting this Motion at any hearing on the subject matter of the Motion, and to file additional and supplemental motions at the conclusion of discovery on such matters, if applicable.

WHEREFORE, based on the foregoing, Capital Funding respectfully requests that the Court enter an order substantially in the form attached as **Exhibit A** (i)(a) dismissing the bankruptcy case filed on behalf of Bellefield, or, alternatively, (b) abstaining from exercising jurisdiction over Bellefield, or, alternatively, (c) lifting the automatic stay to allow the Receiver to consummate a sale of the Bellefield Property, (ii) waiving the turnover requirements under section 543 of the Bankruptcy Code as to the Receiver, and (iii) waiving any fourteen-day stay requirements under Bankruptcy Rule 4001.

DATED: October 17, 2025
        New York, New York

                                        **HOLLAND & KNIGHT LLP**

                                        **By:**  /s/ *Barbra R. Parlin*
                                         Barbra R. Parlin (NJ Bar No. 008211995)
                                         787 Seventh Avenue, 31st Floor
                                         New York, New York 10019
                                         Tel.:  (212) 513-3200
                                         barbra.parlin@hklaw.com

                                         -and-

                                         Tyler Layne (admitted *pro hac vice*)
                                         511 Union Street, Suite 2700
                                         Nashville, TN 37219
                                         Tel.: (615) 244-6380
                                         tyler.layne@hklaw.com

-and-

Steven J. Levitt (admitted *pro hac vice*)
1722 Routh Street, Suite 1500
Dallas, TX 75201
Tel.: (214) 964-9500
steven.levitt@hklaw.com

*Counsel for Capital Funding, LLC*

## CERTIFICATE OF SERVICE

I, Barbra R. Parlin, certify that on October 17, 2025, a true and correct copy of the foregoing was served on all parties entitled to notice via the Court's CM/ECF system.  Additionally, the foregoing was served via first class mail on the parties listed on the service list attached hereto.

*/s/ Barbra R. Parlin*
Barbra R. Parlin